USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 07/15/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BWP MEDIA USA INC. d/b/a PACIFIC
COAST NEWS and NATIONAL PHOTO
GROUP, LLC,

$\qquad$ Plaintiffs,

v.

POLYVORE, INC.,

$\qquad$ Defendant.

No. 13-CV-7867 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

This case epitomizes the truism that litigation—like fashion—requires attention to detail. Plaintiffs own a variety of celebrity photographs and allege that Polyvore, Inc., which operates the fashion/style website polyvore.com, infringed on their copyright interests when some of those photographs appeared on Polyvore's website. In denying Polyvore's motion to dismiss, the Court noted that, in light of the factual nature of Plaintiffs' claims, it would "be in a better position to assess [Plaintiffs'] arguments on summary judgment." Snyder Decl. Ex. 13 at 39:3–4. Plaintiffs nonetheless conducted no depositions during discovery; indeed, they appear not to have participated in discovery in any meaningful way. Now that the parties have cross-moved for summary judgment, the Court is left with approximately as much—or in this case, as little—insight into the critical facts as it could discern from the face of Plaintiffs' pleading. Although Plaintiffs have raised an interesting legal issue as to whether the preservation of metadata, which allows Plaintiffs to identify their photographs on other websites and which Polyvore purportedly deletes, is a "standard technical measure" that Polyvore must accommodate and not interfere with in order to invoke the safe harbor provisions of the Digital Millennium Copyright Act as an affirmative

defense, the Court need not address it. Plaintiffs have not met their initial burden to present proof of any volitional conduct on behalf of Polyvore, and they are thus unable to establish a prima facie case of copyright infringement. On the sparse record before the Court, Plaintiffs have identified no disputed issue of material fact that prevents Polyvore from being entitled to summary judgment as a matter of law. Polyvore's motion for summary judgment is accordingly granted, Plaintiffs' cross-motion is denied, and this case is dismissed.

## BACKGROUND

### I.    Facts

#### A.    The Parties

Plaintiffs "provide[] entertainment-related photojournalism goods and services" and "own[] the rights to a multitude of photographs, primarily featuring celebrities, which [they] license[] to online and print publications for profit." Pls.' 56.1 ¶¶ 1–2, 9–10. Plaintiffs allege that eighty-one of their photographs are at issue in this lawsuit. *See* Am. Compl. Exs. 1 & 2.

Polyvore "is an internet service provider ('ISP') that owns and operates the website located at www.polyvore.com." Pls.' 56.1 ¶ 17. Describing itself as "democratizing style," Polyvore "hosts a user-curated community that allows users to create and share digital collages devoted to fashion, art and design." Def.'s 56.1 ¶ 3. Polyvore "earns revenue from third-party advertisers and commissions from clicks that allow users to purchase products from third-party retailers." *Id.* ¶ 17. Polyvore's website hosted 14.2 million monthly unique visitors and 118 million images at the time this action was filed in 2013, and those numbers have increased since then. *Id.* ¶ 5.

#### B.    Polyvore's Website

Polyvore allows users to create free online accounts to "upload, create and share photographs and other images." Def.'s 56.1 ¶ 6; *see* Pls.' 56.1 ¶¶ 18–19. To facilitate this process,

Polyvore "offers an online tool called the 'Clipper' tool that allows users to 'clip' images from other webpages and collect these images on Polyvore's platform." Def.'s 56.1 ¶ 7; *see* Pls.' 56.1 ¶ 20. The Clipper tool "indexes, stores and makes available for public display all images clipped" to Polyvore's website. Pls.' 56.1 ¶ 22.

Once uploaded by a Polyvore user, each image receives "a hyperlink that links back to the original site that the image came from" and "a unique uniform resource locator ('URL') that identifies the precise location of the image" on Polyvore's website. Def.'s 56.1 ¶ 9; *see* Pls.' 56.1 ¶ 23. Users can then "store and view the uploaded image[] on the Website, modify the background of the image, crop or angle the image, and superimpose the image on top of another image, and transform those images into unique digital collages called 'sets.'" Def.'s 56.1 ¶ 10. Users can submit their sets "in contests sponsored by third parties, post comments on sets and engage in discussions about trends in fashion, art and design." *Id.* ¶ 13. Users can browse and search through the images and sets posted by other Polyvore users. *Id.* ¶¶ 15–16.

All images displayed on Polyvore, "whether in a personalized set created by a user or as a search result, [are] displayed automatically by software and without any interaction by Polyvore's employees." *Id.* ¶ 11. "Any subsequent indexing, storage or display . . . is the result of an automated process that stems from the user's initial upload." *Id.* ¶ 12. "Polyvore cannot and does not screen the source sites or content before displaying them on [its] Website." *Id.*

Although Plaintiffs do not dispute that Polyvore's website functions as described in the three preceding paragraphs, they contend that "Polyvore's software was designed to store duplicate copies of images clipped by users onto the Website." Pls.' Resp. to Def.'s 56.1 ¶ 70. Polyvore disputes Plaintiffs' description to the extent that no evidence in the record "support[s] Plaintiffs' assertion regarding the purpose for which 'Polyvore's software was designed.'" Def.'s Resp. to

Pls.' Resp. to Def.'s 56.1 ¶ 70. Plaintiffs also contend that when users use the Clipper tool to upload images to Polyvore's website, Polyvore creates nine additional copies of each image in varying sizes. *See* Pls.' Resp. to Def.'s 56.1 ¶¶ 68, 71–72. Polyvore disputes this description, but agrees "that an automated process is triggered when a user uploads an image or photograph to the Website with the Clipper tool by which the image or photograph is copied and saved to Polyvore's server." Def.'s Resp. to Pls.' Resp. to Def.'s 56.1 ¶¶ 68, 71–72. The parties accordingly appear to agree that when a user uploads an image to Polyvore's website, Polyvore automatically—that is to say, without any additional human intervention—makes at least one copy of the image and saves it to Polyvore's server.

### C. Plaintiffs' Photographs

For all but two of the eighty-one photographs at issue in this action, it is undisputed for the purposes of the pending cross-motions that (1) Plaintiffs own each photograph, (2) Plaintiffs registered each photograph with the Copyright Office, (3) each photograph was displayed on Polyvore's website, and (4) Polyvore did not have Plaintiffs' permission to display each photograph. *See* Def.'s Resp. to Pls.' 56.1 ¶¶ 29–66, 71–161, 167–330. With regard to the two remaining photographs, Polyvore argues that one is duplicative of another photograph at issue, *see id.* ¶¶ 67–70, and that Plaintiffs misidentify the subject of the other, *see id.* ¶¶ 162–166.

## II. Procedural History

Plaintiffs' First Amended Complaint ("Amended Complaint") raises claims for direct copyright infringement, contributory copyright infringement, vicarious copyright infringement, and inducement of copyright infringement. *See* Am. Compl. ¶¶ 40–74. Polyvore moved to dismiss, but the Court denied Polyvore's motion. *See* Dkt. 33. In analyzing the direct infringement claim, the Court relied on Plaintiffs' allegation that Polyvore employees had "active engagement

4

with the copyrighted material" such that they participated in the process of copying Plaintiffs'

photographs. Snyder Decl. Ex. 13 ("Motion to Dismiss Ruling") at 35:15–16. As to Plaintiffs'

claims for secondary liability, the Court held that it was unable to dismiss the claims as a matter

of law without a more complete factual record. *See id.* at 36:6–38:13.

At the close of discovery—during which Plaintiffs took no depositions, *see* Def.'s 56.1 ¶

67—the parties cross-moved for summary judgment. *See* Dkt. 76, 88. The Court heard oral

argument on July 7, 2016. *See* Dkt. 100.

## LEGAL STANDARD

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute

is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[T]he moving party bears the burden of

demonstrating the absence of a material factual question, and in making this determination, the

court must view all facts 'in the light most favorable' to the non-moving party." *VW Credit, Inc.*

*v. Big Apple Volkswagen, LLC*, No. 11-CV-1950 (PAE), 2012 WL 5964393, at *2 (S.D.N.Y. Nov.

29, 2012) (quoting *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010)).

If the moving party meets its burden, however, "the party opposing summary judgment can

defeat the motion for summary judgment 'only by coming forward with evidence that would be

sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an]

element at trial.'" *Id.* (quoting *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009))

(alterations in original). In other words, "[t]he movant has the burden of showing that there is no

genuine issue of fact, but the [nonmoving party] is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. "[T]he [nonmoving party] must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 257.

"When cross motions for summary judgment are made, the standard is the same for that of individual motions." *JPMorgan Chase Bank, N.A. v. Freyberg*, No. 14-CV-6851 (RMB), 2016 WL 2605209, at *4 (S.D.N.Y. Mar. 17, 2016) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *MIC Gen. Ins. Co. v. Chambers*, No. 15-CV-3324 (JMF), 2016 WL 3198307, at *2 (S.D.N.Y. June 8, 2016) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Figueroa v. Foster*, No. 14-CV-8796 (GHW), 2016 WL 2851335, at *3 (S.D.N.Y. May 12, 2016) (quoting *Morales*, 249 F.3d at 121).

## DISCUSSION

Polyvore argues it is entitled to summary judgment for three independent reasons. First, Polyvore argues that it qualifies for one of the safe harbor provisions in the Digital Millennium Copyright Act ("DMCA"). *See* Def.'s S.J. Mem. at 10–17. The DMCA's safe harbor provisions "protect qualifying Internet service providers from liability for certain claims of copyright infringement." *Capitol Records, LLC v. Vimeo, LLC*, No. 14-1048/1049/1067/1068, 2016 WL 3349368, at *2 (2d Cir. June 16, 2016) (citing *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2012)). Second, Polyvore argues that, in light of the undisputed evidence in the record, Plaintiffs cannot establish the elements of direct and secondary copyright infringement as a matter

of law. *See* Def.'s S.J. Mem. at 17–23. Third, Polyvore argues that it is protected by the fair use doctrine. *See id.* at 24.

Plaintiffs contend that they are entitled to summary judgment on their direct infringement claim. *See* Pls.' S.J. Mem. at 15–17. Neither their motion for summary judgment nor their opposition to Polyvore's motion address their claims for secondary liability.

The Court's inquiry begins with Plaintiffs' claims for copyright infringement, not Polyvore's safe harbor affirmative defense. "[T]he DMCA does not change copyright law; rather, 'Congress provided that [the DMCA's] limitations of liability apply if the provider is found to be liable under existing principles of law.'" *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 n.4 (9th Cir. 2007) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1077 (9th Cir. 2004)). "Given that only those service providers whom antecedent law would hold liable must take refuge in one of [the DMCA's] safe harbors, the plaintiff still bears the burden of proving copyright infringement, which courts must analyze without reference to [the DMCA]." Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12B.06[B][1] (2015) [hereinafter "*Nimmer*"]. The Court should therefore first determine whether Plaintiffs can point to evidence in the record that, viewed in the light most favorable to them, could be used to prove all the elements of copyright infringement at trial.

For the reasons that follow, the Court concludes that Plaintiffs cannot point to such evidence in the record. Polyvore is therefore entitled to summary judgment as a matter of law, and the Court need not address Polyvore's safe harbor and fair use affirmative defenses.

## I. Direct Infringement

A claim for direct copyright infringement contains two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns,*

*Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Polyvore concedes, for the purposes of the pending cross-motions, that Plaintiffs own valid copyrights in the relevant photographs. *See* Oral Arg. Tr. at 39:1–8. Polyvore also concedes that exact copies of the photographs appeared on its website. *See id.*

In most cases, this would end the inquiry. In most cases, however, "the allegedly infringing act and the identity of the infringer are never in doubt." *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 130 (2d Cir. 2008) [hereinafter "*Cablevision*"]. When the identity of the infringer is in doubt, as it is here, "[t]he question is *who* made th[e] cop[ies]." *Id.* (emphasis in original).

In *Cablevision*, the Second Circuit considered whether the operator of a "Remote Storage DVR System" could be liable for direct copyright infringement because it allowed subscribers to select television programs to record and stored digital copies of the programs subscribers selected on its own server. *See id.* at 124–25. One claim raised by the copyright owners was that "by copying programs onto [its server], Cablevision . . . directly infringe[d] the reproduction right" contained in 17 U.S.C. § 106(1). *Id.* at 125. The Second Circuit disagreed. The court instead endorsed two out-of-circuit decisions that imposed a "volitional conduct" requirement on direct infringement claims, such that the "volitional conduct that causes the copy to be made" must be performed by the defendant and not someone else. *See id.* at 130–31 (citing *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004); *Religious Tech. Ctr. v. Netcom On-Line Commc'ns Servs.*, 907 F. Supp. 1361 (N.D. Cal. 1995)).

These two out-of-circuit cases—*CoStar* and *Netcom*—further explain the volitional conduct requirement, and *Cablevision* relied on the holdings of both. The Second Circuit noted that in *Netcom*, the court held that an ISP could not be liable for direct infringement when a

customer uploaded copyrighted work that was automatically reproduced because "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." *Id.* at 130 (quoting *Netcom*, 907 F. Supp. at 1370). Similarly, *Cablevision* recognized that in *CoStar*— another case involving an ISP—the Fourth Circuit concluded that

> to establish *direct* liability under . . . the [Copyright] Act, something more must be shown than mere ownership of a machine used by others to make illegal copies.  There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner.

*Id.* (quoting *CoStar*, 373 F.3d at 550).  Both the Second Circuit in *Cablevision* and the Fourth Circuit in *CoStar* found *Netcom* to be "a particularly rational interpretation" of the Copyright Act. *Id.* (quoting *CoStar*, 373 F.3d at 551).  The *Cablevision* court ultimately concluded that "volitional conduct is an important element of direct liability" and that "[i]n determining who actually 'makes' a copy, a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct." *Id.* at 131.

In determining whether a defendant who designs and houses an automated system acts volitionally post-*Cablevision*, "[c]ourts have looked to the purpose and general use of the service in question, finding 'volitional conduct' where a service or program was designed solely to collect and sell copyrighted material, and where a program collected material that its creators knew to be copyrighted." *Smith v. BarnesandNoble.com, LLC*, 143 F. Supp. 3d 115, 122 (S.D.N.Y. 2015) (internal citations omitted).  In a case, therefore, in which the defendant "built a service where *only* copyrighted work could be sold," the plaintiff was entitled to summary judgment despite *Cablevision*. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 657 (S.D.N.Y. 2013)

9

(holding that a defendant acted volitionally as a matter of law because it created a computer program that "scan[ned] a user's computer to build a list of eligible files that consisted *solely* of protected music purchased on iTunes") (emphasis in original). Similarly, there was sufficient evidence to support a jury's verdict that a defendant acted volitionally in a case in which the defendant "creat[ed] a feature to automatically retrieve [music album] cover art from Amazon.com" and make digital copies of it. *Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 720 (S.D.N.Y. 2014). In short, these defendants provided "contribution[s] to the creation of . . . infringing cop[ies that were] so great that it warrant[ed] holding th[ose] part[ies] directly liable for the infringement, even though []other part[ies] . . . actually made the cop[ies]." *Cablevision*, 536 F.3d at 133.

Outside of these narrow circumstances, however, courts in this district have dismissed direct infringement claims when plaintiffs can show only that the defendants created and housed automated systems through which plaintiffs' works were copied. *See, e.g.*, *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 742 (S.D.N.Y. 2012) (granting defendant's summary judgment motion when there was "no dispute that any reproduction, display or transmission of the [p]laintiff's images by or through the [defendants'] website [was] an automated process with no human intervention by any employee of the [defendants]"); *see also Smith*, 143 F. Supp. 3d at 122–23.

Applying *Cablevision* and its progeny here, no reasonable juror could find that Polyvore acted volitionally. It is undisputed that images appear on Polyvore's website "without any interaction by Polyvore's employees" and that "[a]ny subsequent indexing, storage or display . . . is the result of an automated process that stems from the user's initial upload." Def.'s 56.1 ¶¶ 11–12; Pls.' Resp. to Def.'s 56.1 ¶¶ 11–12. Although Plaintiffs attempt to draw an analogy between

Polyvore's automated system and the system at issue in *MP3tunes*, *see* Pls.' S.J. Reply Mem. at 9, the Court does not find the two sufficiently similar. In *MP3tunes*, the jury found, based on the evidence presented at trial, that one of the defendants "designed MP3tunes' software to retrieve cover art from Amazon.com whenever a user uploaded music files to an MP3tunes locker." 48 F. Supp. 3d at 720. Here, however, nothing in the record suggests that Polyvore's Clipper tool was designed specifically to infringe anyone's copyright interests. Without any deposition testimony or documentary evidence from Polyvore employees, the record is ultimately silent on this point. The Clipper tool, moreover, allows users to clip images from anywhere online, not locations that display only copyrighted material. *See* Def.'s 56.1 ¶ 7; Pls.' 56.1 ¶ 20; Oral Arg. Tr. at 4:4–9 (Plaintiff's counsel acknowledging that "[t]here are images [on Polyvore's website] that may not have been copyrighted or registered"). There is thus no dispute that Polyvore users can use the Clipper to clip both copyrighted and non-copyrighted images. Polyvore accordingly "d[oes] not have a 'fundamental and deliberate role,' such that it [is] transformed 'from a passive provider of a space in which infringing activities happen[] to occur to an active participant in the process of copyright infringement.'" *Smith*, 143 F. Supp. 3d at 123 (quoting *ReDigi*, 934 F. Supp. 2d at 657).

Plaintiffs also argue that *Cablevision*'s volitional conduct requirement should not apply in this case because Polyvore, unlike the defendants in *Cablevision*, is an ISP that can invoke the safe harbor provisions of the DMCA. *See* Pls.' S.J. Reply Mem. at 5–9; 17 U.S.C. § 512(a) (limiting benefits of safe harbors to "service providers"). Plaintiffs appear to contend that the DMCA's safe harbors provide the exclusive defenses available to ISPs accused of copyright infringement. According to Plaintiffs, "[i]mplicit" in § 512 and the purposes of the DMCA "is a recognition that, absent the safe harbor, an ISP would be held liable for infringements uploaded by a user." Pls.' S.J. Reply Mem. at 6. Plaintiffs argue that the volitional conduct requirement is accordingly

11

inconsistent with the safe harbors in that ISPs could avoid liability by ensuring that they do not act volitionally instead of by ensuring that they qualify for a safe harbor. As Plaintiffs put it, the volitional conduct requirement "create[s] a disincentive for an ISP to comply with the DMCA, as it would result in a myriad of obligations for the ISP which it could otherwise evade by merely saying[,] 'I didn't do it[,] a user did[,] and therefore the[r]e is no volitional conduct.'" *Id.* at 7.

The text of the DMCA and its legislative history make clear that the DMCA does not excuse a plaintiff from establishing volitional conduct simply because the defendant is an ISP. The DMCA expressly provides that "[t]he failure of a service provider's conduct to qualify for [the safe harbors] shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense." 17 U.S.C. § 512(l). Both the House and Senate reports recommending that the DMCA be passed added that "Section 512 is not intended to imply that a service provider is or is not liable as an infringer either for conduct that qualifies for a [safe harbor] or for conduct that fails to so qualify. Rather, the [safe harbors] apply if the [ISP] is found to be liable under existing principles of law." H. Rep. No. 105-551 Pt. 2, at 50 (1998); S. Rep. No. 105-190, at 19, 40 (1998). In light of this unambiguous statutory language and clear legislative history, the Court rejects Plaintiffs' argument that, in passing the DMCA, Congress intended to subject ISPs to different standards of copyright liability than non-ISPs. The DMCA instead "makes explicit that its [safe harbors] only augment service providers' arsenal of defenses, rather than serving to diminish their rights." *Nimmer* § 12B.06[B][1].

Court decisions interpreting the volitional conduct requirement, moreover, recognize that ISPs are not immune from all copyright liability by virtue of not acting volitionally. This is so because the volitional conduct requirement applies only to claims of *direct* copyright infringement

and not to claims for secondary liability.  Indeed, the *Cablevision* court noted that even if

Cablevision lacked volitional conduct, it "would then face, at most, secondary liability, a theory

of liability expressly disavowed by [the *Cablevision*] plaintiffs." 536 F.3d at 130; *see also Am.*

*Broad. Cos. v. Aereo, Inc.*, 134 S. Ct. 2498, 2513–14 (2014) (Scalia, J., dissenting) (noting that the

Court's cases "are fully consistent with a volitional-conduct requirement," the purpose of which

"is not to excuse defendants from accountability, but to channel the claims against them into the

correct analytical track" as claims for secondary liability).[1]  District courts have also recognized

that *Cablevision* does not require a plaintiff to show volitional conduct to establish a claim for

secondary liability.  *See UMG Recording, Inc. v. Escape Media Grp., Inc.*, No. 11-CV-8407

(TPG), 2014 WL 5089743, at *21 (S.D.N.Y. Sept. 29, 2014) (noting that "[d]irect liability requires

'volitional conduct,'" and that secondary liability does not); *ReDigi*, 934 F. Supp. 2d at 656 (same).

    The Court accordingly disagrees with Plaintiffs as to whether, in light of the volitional

conduct requirement, ISPs face any disincentive to comply with the safe harbor provisions of the

DMCA.  The safe harbors protect ISPs from claims under all theories of copyright liability, not

merely direct infringement.  *See* 17 U.S.C. § 512(a).  An ISP that does not act volitionally but

ignores the DMCA's safe harbors would thus face *more* potential liability than an ISP that acts

---

[1] Plaintiffs argue that because the majority opinion in *Aereo* does not mention the volitional conduct requirement, Polyvore can be held liable for direct infringement "regardless of the commission of a volitional act." Pls.' S.J. Reply Mem. at 8.  The relevant facts in *Aereo*, however, are distinguishable from those here. *Aereo* concerned the Copyright Act's Transmit Clause and involved "a technologically complex service that allow[ed users] to watch television programs over the Internet at about the same time as the programs [were] broadcast over the air." 134 S. Ct. at 2503.  The Court concluded that "the many similarities between [the service] and cable companies" distinguished the service from "equipment supplier[s]" who provide the means to infringe copyrights but do not actually infringe them. *Id.* at 2507.  In reaching this conclusion, the Court recognized that "a user's involvement in the operation of [a] provider's equipment and selection of the content transmitted may well bear on whether the provider" faces direct liability under the Copyright Act. *Id.* Here, although Polyvore provides equipment—namely, the Clipper tool and Polyvore's web platform—it is Polyvore's users who select the content (which may or may not be copyrighted) to be uploaded and displayed.  In any event, this Court is bound to follow *Cablevision* "unless and until it is overruled in a precedential opinion by the Second Circuit itself or 'unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'"  *Doscher v. Sea Port Grp. Sec., LLC*, No. 15-CV-384 (JMF), 2015 WL 4643159, at *3 (S.D.N.Y. Aug. 5, 2015) (quoting *United States v. Emmenegger*, 329 F. Supp. 2d 416, 429 (S.D.N.Y. 2004)).  This rigid standard has not been met here.

volitionally but successfully asserts a safe harbor defense because the first ISP could potentially face secondary liability while the second ISP would not. Plaintiffs have it backward.

For these reasons, the Court concludes that Plaintiffs must establish that Polyvore acted volitionally to prove its claim for direct copyright infringement. As no evidence in the record suggests that Polyvore so acted, Polyvore is entitled to summary judgment on Plaintiffs' direct infringement claim as a matter of law.

## II.    Secondary Liability

Polyvore next argues that it is also entitled to summary judgment on Plaintiffs' claims for secondary liability. *See* Def.'s S.J. Mem. at 19–23. Plaintiffs do not cross-move for summary judgment on their secondary liability claims, nor do they address these claims in their opposition to Polyvore's motion. Polyvore thus also argues that the secondary liability claims should be dismissed because Plaintiffs have abandoned them. *See* Def.'s S.J. Reply Mem. at 10.

Generally, "[w]here a party fails to raise an 'argument in his opposition to summary judgment,' that 'argument has been waived.'" *Avillan v. Donahoe*, No. 13-CV-509 (PAE), 2015 WL 728169, at *7 (S.D.N.Y. Feb. 19, 2015) (quoting *Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004)). Nonetheless, "courts, 'in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'" *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (quoting *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993)).

Plaintiffs raise three secondary liability claims: (1) contributory infringement, *see* Am. Compl. ¶¶ 48–56; (2) vicarious infringement, *see id.* ¶¶ 57–66; and (3) inducement of

infringement, *see id.* ¶¶ 67–74.  The Court grants summary judgment to Polyvore with respect to all three.

### A.    Contributory Infringement

"A defendant may be held liable for contributory copyright infringement if, 'with knowledge of the infringing activity,' it 'materially contributes to the infringing conduct of another.'" *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011) (quoting *Matthew Bender & Co. v. West Pub. Co.*, 158 F.3d 693, 706 (2d Cir. 1998)).  Pursuant to what is known as the *Sony–Betamax* rule, however, "a defendant who distributes a product that materially contributes to copyright infringement *will not* be liable for contributory infringement if the product also is 'widely used for legitimate, unobjectionable purposes' or is 'merely . . . capable of substantial noninfringing use.'" *Id.* (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984)) (emphasis in original).

Here, even assuming that Polyvore had knowledge of the infringing activity and materially contributed to copyright infringement, the *Sony–Betamax* rule shields Polyvore from liability.  As noted above, the Clipper tool allows users to clip images from anywhere online, copyrighted or not.  These features make Polyvore's system, at the very least, "capable of substantial noninfringing use." *Sony*, 464 U.S. at 442; *see Smith*, 143 F. Supp. 3d at 125–26.  Polyvore is accordingly entitled to summary judgment on Plaintiffs' contributory infringement claim.

### B.    Vicarious Infringement

A claim for vicarious liability requires a plaintiff "to demonstrate that the defendant (1) had the right and ability to supervise the infringing activity and (2) has a direct financial interest in such activities." *UMG Recording*, 2014 WL 5089743, at *23 (citing *Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.3d 1159, 1162 (2d Cir. 1971)).  "The first element . . . is

satisfied if the plaintiff proves that the defendant had the ability to supervise or control the third parties' infringing activity and failed to do so." *Arista Records*, 784 F. Supp. 2d at 435. "The second element . . . requires showing a 'causal relationship between the infringing activity and any financial benefit [the] defendant reaps.'" *Id.* (quoting *Ellison*, 357 F.3d at 1079). The financial benefit "need not be tied directly to sales of the infringing goods" and "may be established by evidence showing that users are attracted to a defendant's product because it enables infringement, and that use of the product for infringement financially benefits the defendant." *Id.* (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263 (9th Cir. 1996)).

The evidence in the record does not support either element. The record is devoid of evidence regarding Polyvore's ability to supervise or control the activity of its users. Similarly, no facts in the record establish a causal relationship between any infringing activity on Polyvore's website and any financial benefit Polyvore received. Nor do any facts in the record establish that Polyvore's users are attracted to the site because it enables infringement. Polyvore is thus entitled to summary judgment on Plaintiffs' claim of vicarious infringement.

### C.   Inducement of Infringement

To be liable for inducing others to infringe copyrights, a defendant must "distribute[] a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936–37 (2005). "The inducement rule . . . premises liability on purposeful, culpable expression and conduct," such that "mere knowledge of infringing potential or of actual infringing uses would not be enough." *Id.* at 937. No evidence in the record here supports an inference that Polyvore purposefully sought to infringe copyright. The Court thus grants Polyvore summary judgment on Plaintiffs' inducement of infringement claim.

### III.    Attorneys' Fees

In addition to the dismissal of all the claims against it, Polyvore seeks attorneys' fees pursuant to 17 U.S.C. § 505. *See* Def.'s S.J. Mem. at 24–25. Section 505 provides that in copyright actions, "the court in its discretion may allow the recovery of full costs by or against any party other than the United States" and that "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Polyvore argues that a fee award is justified here because Plaintiffs pursued a "frivolous case" and "sat on the sidelines and failed to take a single deposition or participate in the discovery process in good faith." Def.'s S.J. Mem. at 24–25. Plaintiffs argue that a fee award here is not warranted because Polyvore "engaged in conduct constituting infringement separate and apart from that alleged against its users and, therefore, an award of fees would operate to chill putative plaintiffs from seeking redress for violations of their rights under the law." Pls.' S.J. Opp. Mem. at 23. The Court denies Polyvore's request for attorneys' fees.

The Supreme Court recently clarified that "§ 505 confers broad discretion on district courts and, in deciding whether to fee-shift, they must take into account a range of considerations beyond the reasonableness of litigating positions." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1988 (2016). "That means in any given case a court may award fees even though the losing party offered reasonable arguments (or, conversely, deny fees even though the losing party made unreasonable ones)." *Id.* "Although objective reasonableness carries significant weight, courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals." *Id.* at 1989. In other words, courts must "give 'substantial weight' to the reasonableness of a losing party's litigating positions," but must not "turn[] 'substantial' into more nearly 'dispositive' weight." *Id.*

17

Although the Court disagrees with Plaintiffs on the merits, it does not construe their arguments as being objectively unreasonable or frivolous. It is undisputed that more than 75 photographs owned by Plaintiffs appeared on Polyvore's website without permission. Moreover, the Court denied Polyvore's motion to dismiss this action, as Plaintiffs' claims were plausible when this case was filed. Plaintiffs' "inability to substantiate any of [their] allegations . . . does not as a matter of law *require* an award of fees." *Viva Video, Inc. v. Cabrera*, 9 F. App'x 77, 80 (2d Cir. 2001) (affirming district court's decision to deny fees "with regard to general objective unreasonableness and bad faith") (emphasis in original).

Nor does the Court believe Plaintiffs' conduct during the discovery process and motion practice warrants a fee award. Although Plaintiffs should have been more diligent in seeking discovery in a timely manner, there is no evidence of bad faith or misconduct before the Court.

In *Kirtsaeng*, the Supreme Court instructed that in analyzing requests for fees pursuant to § 505, "courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals." 136 S. Ct. at 1989. Taking all those circumstances into account—and in light of the Copyright Act's attempt to "balance . . . two subsidiary aims: encouraging and rewarding authors' creations while also enabling others to build on that work," *id.* at 1986—the Court concludes that no award of attorneys' fees is warranted in this case.

## CONCLUSION

Defendant's motion for summary judgment is granted, and Plaintiff's cross-motion for summary judgment is denied. Defendant's request for attorneys' fees is denied. The Clerk of Court is respectfully directed to terminate items 76 and 88 on the docket and to close this case.

SO ORDERED.

Dated:     July 15, 2016
           New York, New York

Ronnie Abrams
United States District Judge

19